IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Debra Ring, | : | |
| | : | Case No. 1:10-cv-179 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING MOTION TO |
| Roto-Rooter Services Company, | : | DISMISS IN PART AND DENYING |
| | : | AS MOOT MOTION TO TRANSFER |
| Defendant. | : | VENUE |

This matter is before the Court on Defendant's Motion to Dismiss (doc. 5) on the basis of improper venue and Defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (doc. 6).  Defendant asserts that venue is improper in the Southern District of Ohio and that Plaintiff's suit should proceed only in the Eastern District of Missouri.  On June 9, 2010, the Court denied in part the pending Motion to Dismiss insofar as Defendant moved for dismissal on grounds unrelated to venue.  (Doc. 24.)  The Court deferred ruling on Defendant's improper venue arguments in order to conduct an evidentiary hearing.  The Court held an evidentiary hearing on venue on August 12, 2010.

With leave of the Court, Plaintiff filed a First Amended Class Action Complaint ("Amended Complaint") (doc. 30) on August 17, 2010.  Both pending motions are applicable to the Amended Complaint.  (Doc. 33.)  The motions are ripe for final adjudication.  For the reasons that follow, the Court will **GRANT IN PART** the Motion to Dismiss, **TRANSFER THIS CASE TO THE EASTERN DISTRICT OF MISSOURI** pursuant to 28 U.S.C. § 1406(a), and **DENY AS MOOT** the Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a).

1

I.    BACKGROUND

A.    Plaintiff's Allegations in the Amended Complaint

Plaintiff's Amended Complaint is twenty-four pages long and contains more than one hundred paragraphs of factual allegations, but the material allegations can be summarized more briefly.[1]  Plaintiff Debra Ring is a citizen and resident of St. Charles County, Missouri.  (Doc. 30 ¶ 21.)  Defendant Roto-Rooter Services Company ("Roto-Rooter") is an Iowa corporation with its headquarters located in Cincinnati, Ohio.  (*Id.* ¶¶ 22-23.)  Ring began her employment with Roto-Rooter in 1998 as an accounts receivable manager.  (*Id.* ¶ 21.)  She currently is employed as an officer manager at a St. Louis, Missouri branch office.  (*Id.*)  Her immediate supervisors at Roto-Rooter in St. Louis are Rick Maloney and Steve Tranchilla.  (*Id.* ¶ 12.)

During her employment with Roto-Rooter, Ring has held the title of office manager and direct sales specialist.  (*Id.* ¶¶ 58, 61.)  Ring alleges that she is qualified for the position of sales manager and that she has performed the duties of the sales manager position for both of Roto-Rooter's St. Louis branches.  (*Id.* ¶¶ 63, 65.)  She alleges that she has expressed interest in acquiring the sales manager position and other management positions on many occasions during her career at Roto-Rooter.  (*Id.* ¶ 74.)  She alleges that she was denied the opportunity to apply for a vacant sales manager position at the north St. Louis branch because Roto-Rooter hired a person from outside the company to fill the position in July 2008 without ever posting the vacancy.  (*Id.* ¶¶ 67, 70.)

Ring further alleges that during her yearly evaluation in June 2009, she told Maloney, her

_____

[1] The recitation of factual allegations is at times repetitive.  (*E.g.*, doc. 30 ¶¶ 4, 16, and 83 (regarding Sandy Findeiss); *id.* ¶¶ 9, 23-25, 42, and 53 (regarding the location of the corporate headquarters)).

branch general manager, that she wanted to be promoted to the sales manager position. (*Id.* ¶ 75.) She alleges that Maloney responded that she could not advance to a higher position at Roto-Rooter. (*Id.* ¶ 76.) He did not give a reason for his response. (*Id.*)

Ring alleges that the local management decisions implemented by Maloney and Tranchilla were made pursuant to Roto-Rooter's national corporate policy. (*Id.* ¶¶ 11-13, 43.) She alleges that Roto-Rooter enforces a companywide policy to discriminate against women by excluding them from upper-level management positions within the company. (*Id.* ¶¶ 6-8.) She alleges, based on information and belief, that Roto-Rooter has a policy to promote men and exclude women despite the fact that the candidates for management positions consist of men and women with similar training, education, and experience. (*Id.* ¶¶ 13-15.) She further alleges that Roto-Rooter systematically prevents women from applying for open management positions by failing to post or provide notice that the positions are available. (*Id.* ¶ 84.) She alleges that the companywide discriminatory policy emanates from corporate headquarters in Cincinnati. (*Id.* ¶¶ 26, 45.) As evidence of this companywide policy, Ring points out that Roto-Rooter has only had one upper-level female manager, Sandy Findeiss, out of more than one hundred upper-level management employees. (*Id.* ¶¶ 4, 16.) Ring alleges that Findeiss was demoted without cause on two occasions and has sued Roto-Rooter for gender discrimination. (*Id.* ¶ 4.)

## B.  Hearing Testimony

The Court held an evidentiary hearing in this matter on August 12, 2010 because the parties disputed material facts concerning where the alleged discrimination occurred and where Roto-Rooter maintains employment records. The Court heard testimony from Chana Stewart-Blalark ("Stewart"), Roto-Rooter's director of human resources, and Steve Tranchilla, the vice-

3

president of the West region, which includes the two St. Louis branches.  (Tr. at 17, 58.)  Stewart

works at Roto-Rooter's headquarters in Cincinnati, Ohio.  She testified that Roto-Rooter

maintains fifty-two branches nationwide organized into five regions.  (*Id.* at 17, 19.)  Each

branch has a general manager and those general managers report to one of the five regional vice-

presidents.  (*Id.* at 19-20.)  All fifty-two general managers are men at this time.  (*Id.* at 36.)

Roto-Rooter has employed two female general managers during Stewart's nine-year tenure at the

company.  (*Id.* at 56.)  Tranchilla testified that each branch has approximately forty-five

employees, including a field training manager, a production manager, the general manager, and

sometimes additional managers.  (*Id.* at 61.)

 The general manager for each branch works with his regional vice-president to recruit

and hire employees and lower-level managers for his branch.  (*Id.* at 20-22, 62.)  The general

manager determines whether to advertise or post employment vacancies at the branch level.  (*Id.*

at 22-23.)  The general manager also makes promotion, evaluation, demotion, salary, and

discipline decisions at the branch level.  (*Id.* at 23-24, 62-63.)  Stewart does not have any

involvement in promotion decisions at the branch level.  (*Id.* at 24.)  Stewart did not have any

involvement in decisions regarding Ring's hiring, pay level, denial of promotions, or discipline.

(*Id.* at 32.)

On cross-examination, Stewart stated that she was knowledgeable about Roto-Rooter's

hiring and firing practices.  (*Id.* at 37.)  She testified that she could not "think of any explanation

for how anybody below the home office level could create a nationwide underrepresentation of

women at Roto-Rooter."  (*Id.* at 34-35.)  She conceded that a vice-president of one region could

not directly affect hiring and firing practices in a different region.  (*Id.* at 38.)  She also testified

4

that the company has set nationwide criteria for hiring and has nationwide policies regarding gender discrimination.  (*Id.* at 39, 41-42, 50.)  She did not testify that Roto-Rooter has a policy against hiring women for upper-management positions.  Tranchilla concurred that any nationwide Roto-Rooter policy would emanate from corporate headquarters.  (*Id.* at 70.)  He also testified that corporate headquarters initiated quarterly training calls on matters such as gender issues.  (*Id.* at 71.)  He denied that Roto-Rooter has a policy against hiring or promoting women into upper-level management positions.  (*Id.*)

As to employment records, a physical copy of each branch office employee's personnel file is maintained at the branch.  (*Id.* at 24-25.)  The personnel file includes an employee's application, salary information, offer letter, benefits-related materials, performance reviews, records related to promotions or denials of promotions, and formal and informal disciplinary history.  (*Id.* at 25-27.)  Certain personnel information also is entered into computer systems which can be accessed from company headquarters.  (*Id.* at 28-29.)  The electronic records include payroll information, including name, gender, and date of hire, and formal discipline reports.  (*Id.* at 28-29, 47.)

Not all information that is maintained in the branch personnel files is available electronically at headquarters.  (*Id.* at 31.)  The most complete copy of each employee's personnel file is maintained at his or her branch.  (*Id.* at 55, 64.)  On the other hand, regional offices have access only to the electronic records relevant to their region.  For example, employees who work in a St. Louis branch or in the West region cannot access information regarding payroll and gender for New York branch employees.  (*Id.* at 47-48.)

C.      **Procedural Posture**

In the Amended Complaint, Ring has asserted one claim against Roto-Rooter for sexual discrimination by disparate treatment in violation of Title VII.  Ring also requests class action certification in the Amended Complaint, but she has not yet moved for certification.  Roto-Rooter moved for dismissal in lieu of filing an answer.

**II.      STANDARD OF LAW FOR RULE 12(b)(3)**

Roto-Rooter moves for dismissal for improper venue based on Rule 12(b)(3) of the Federal Rules of Civil Procedure.  The plaintiff bears the burden of establishing proper venue after an objection to venue has been raised.  *See Centerville ALF, Inc. v. Balanced Care Corp.*, 197 F. Supp. 2d 1039, 1046 (S.D. Ohio 2002).  A district court has discretion to choose the appropriate procedure for deciding a motion to dismiss for improper venue.  *Id.*  A district court may hold an evidentiary hearing, or alternatively, may determine a venue motion without a hearing on the basis of the affidavits alone.  *Id.*  "If the plaintiff presents a prima facie case that venue is proper, after reading the pleadings and affidavits in the light most favorable to the plaintiff, the defendant's motion will be denied."  *Zimmer Enters., Inc. v. Atlandia Imps., Inc.*, 478 F. Supp. 2d 983, 986 (S.D. Ohio 2007).  The court need not consider allegations made by a defendant contrary to those presented by the plaintiff if the court makes its determination upon the pleadings and affidavits without a hearing.  *Centerville ALF*, 197 F. Supp. 2d at 1046.  However, "[i]f the written submissions raise disputed issues of fact or seem to require determinations of credibility, the court retains the power to order an evidentiary hearing."  *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (referring to the analogous procedure for personal jurisdiction determinations).

6

This Court held an evidentiary to resolve material fact disputes concerning venue on August 12, 2010.

## III.    ANALYSIS

Title's VII's venue statute provides as follows:

> Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter.  Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).  Roto-Rooter moves to dismiss on the basis that the alleged unlawful employment practice occurred in the St. Louis, Missouri area and that the relevant employment records are maintained in St. Louis.  Ring asserts that venue is proper in Ohio because the alleged unlawful employment action taken against her was the result of discriminatory policies and practices which emanate from Roto-Rooter's corporate headquarters in Cincinnati, Ohio. Ring also asserts that the nationwide employment records she will need to establish her proposed class action claim are located in or can be accessed most efficiently from Cincinnati.

Preliminarily, the Court will examine only Ring's allegations of personal disparate treatment to determine where venue is proper.  "The law is clear that in determining whether venue for a putative class action is proper, courts are to look only at the allegations pertaining to the named representatives."  *Cook v. UBS Fin. Servs., Inc.*, No. 05 Civ. 8842, 2006 WL 760284, at *3, 6 n.2 (S.D.N.Y. Mar. 21, 2006) (citing 7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ.3d § 1757); *see also Tahir v. Avis Budget Group, Inc.*, CIV. A. 09-3495, 2009 WL 4911941,

7

at *5 (D.N.J. Dec. 14, 2009) (same); *Turnley v. Banc of Am. Inv. Servs., Inc.*, 576 F. Supp. 2d 204, 212 (D. Mass. 2008) (same); *Smith v. Burlington N. Santa Fe Ry. Co., Inc.*, No. 06-2151, 2006 WL 3192545, at *2 (D. Kan. Nov. 1, 2006 (refusing to consider allegations specific to class members to determine venue). Ring cites no authority to the contrary.

Next, Ring's allegations and the testimony of Chana Stewart-Blalark and Steve Tranchilla indicate that the alleged unlawful discriminatory actions taken against Ring occurred in Missouri. Ring has been employed at the St. Louis branches throughout her tenure at Roto-Rooter. The sales manager position which she sought was located in St. Louis. Stewart and Tranchilla testified that Ring's branch general manager, in consultation with the regional vice-president, made the hiring, evaluation, and promotions decisions for the positions at Roto-Rooter which Ring held and to which she sought to be promoted. Stewart also testified that the branch general manager would have made the decision whether to post or advertise the sales manager position vacancy. Additionally, Ring's most complete personnel file is in Missouri. Ring did not explain how the limited electronic records accessible in Cincinnati, including her date of hire, gender, and salary, and formal discipline reports, would help establish that her St. Louis supervisors discriminated against her by denying her a promotion. Accordingly, the Court holds that venue for Ring's Title VII claim is proper in the Eastern District of Missouri pursuant to 42 U.S.C. § 2000e-5(f)(3).

Ring's allegations that her St. Louis supervisors were following a companywide discriminatory policy emanating from headquarters in Cincinnati does not make venue proper in this District. Ring presented no evidence at the evidentiary hearing that any such policy exists. The witnesses' speculation that *if* a companywide discriminatory policy existed, then it would

originate at company headquarters in Cincinnati, is not sufficient at this preliminary stage to indicate that Roto-Rooter discriminated against Ring in this District.  To the contrary, the witnesses testified that the decisions affecting Ring would have been made at the branch level.

Moreover, other courts have rejected similar arguments by employees who posited that venue was proper in the district where the company was headquartered and made policy decisions, and not at the local office at which the employees worked.  *See*, *e.g.*, *Cook v. UBS Fin. Servs., Inc.*, No. 05 Civ. 8842, 2006 WL 760284, at *3-4 (S.D.N.Y. Mar. 21, 2006); *Darby v. U.S. Dep't of En.*, 231 F. Supp. 2d 274, 277 (D.D.C. 2002); *Donnell v. Nat'l Guard Bureau*, 568 F. Supp. 93, 94 (D.D.C. 1983); *cf. Brightwell v. Fifth Third Bank of Mich.*, Nos. 138920, 138921, — N.W.2d—, 2010 WL 2990298, at *4-6 (Mich. July 30, 2010) (holding that adverse action takes place under Michigan's Civil Rights Act where the employee worked, not where the discriminatory decision was made).  In such cases, the courts found that venue was proper in the district where the employees worked because that is where the specific decisions impacting the plaintiff were made or where the most substantial part of the discriminatory conduct occurred. *See*, *e.g.*, *Cook*, 2006 WL 760284, at *3-4 (dismissing for improper venue where broad-based personnel policies may have been approved at the company's New York headquarters, but the specific personnel decisions impacting plaintiff occurred in Maryland); *Darby*, 231 F. Supp. 2d at 277 ("Specifically, venue cannot lie in the District of Columbia when a substantial part, if not all, of the employment practices challenged in this action took place outside the District even when actions taken in the District may have had an impact on the plaintiff's situation.") (internal quotation omitted); *Donnell*, 568 F. Supp. at 94 ("It seems clear that a substantial part, if not all, of the employment practices challenged in this action were committed in Virginia at the National

Guard Bureau office where plaintiff is employed. While the decisions of individuals at the Equal Employment Opportunity branch and the Civilian Personnel Directorate of the AMDW may have had an impact on plaintiff's situation, the focus of his complaint is the National Guard Bureau.").

The Court has found two cases in which the courts permitted venue in the district where the companies had their principal places of business. In *Turnley*, multiple African-American employees and former employees of Bank of America alleged that the company systematically discriminated against African-Americans. 576 F. Supp. 2d at 207-08. The named plaintiffs, who sought to represent a class, worked at Bank of America offices in Atlanta, Georgia; Boston, Massachusetts; St. Louis, Missouri; and Los Angeles, California. *Id.* The plaintiffs filed suit in Boston, Massachusetts where Bank of America had its principal place of business. *Id.* at 211. Bank of American challenged venue as to two named plaintiffs who worked in Atlanta and St. Louis, respectively.

The *Turnley* plaintiffs pleaded both disparate treatment and disparate impact discrimination. *Id.* at 208-09. The court described the plaintiffs' allegations as follows:

> Plaintiffs allege a nationwide pattern and practice of discrimination, including, *inter alia*, its practice of partnering minority Financial Advisors with minority Private Bankers and then "steering" the minority partnerships to low net-worth sales territories, territories largely comprised of African-American client pools. Defendants' Boston senior management, plaintiffs claim, is directly responsible for the discrimination because of the way they have chosen to allocate decisionmaking authority over account and territorial assignments. Senior management has delegated the allocation of business opportunities to the subjective preferences of local managers across the country, managers who, plaintiffs claim, have systematically disadvantaged African-American employees of the company in the kinds of accounts they have received, in the support they are given for those accounts, in their compensation, and in their rates of promotion.

10

*Id.*  The court noted that Bank of America posited a "diametrically different" view of the complaint, arguing that the plaintiffs had alleged "an amalgam of unrelated and independent claims" or "a congeries of disparate treatment claims" based on local management decisions.  *Id.* at 209.

The court noted that to resolve the venue question, it was being asked to "take a position on the merits of the case—a decision about how discrimination occurred in this company, to the extent that it occurred at all, by whom, and in what way—and to do so at an early stage in the litigation."  *Id.*  The court stated that to determine where the unlawful act was committed it had to examine whether "the evidence submitted by the defendants defeats plaintiffs' framing of the case in the complaint."  *Id.* at 212.  The court concluded that Bank of America had not refuted with evidence that the "core discriminatory practice alleged—namely, the granting of unfettered decisionmaking authority to regional and local managers in matters of territorial assignments, partnering, etc. with or without discriminatory intent—was committed in Massachusetts."  *Id.* at 216.  Nonetheless, in dicta, the court recognized a danger that plaintiffs could seek to avoid the strictures of Title VII's venue provision, and attempt to always place venue in the district of the employer's headquarters, by suggesting that all corporate decisions arise in some manner from corporate headquarters.  *See id.* at 216 n. 13.  Allowing plaintiffs to sue their employers in the district where the company headquarters is located based on vague allegations would thwart the Title VII venue provision.  Title VII allows venue in the district of  the defendant's principal office only where no other venue is appropriate.  *See id.*  The court nonetheless concluded that because the plaintiffs had sufficiently pleaded disparate impact claims, venue was appropriate in the district "where those with the decisionmaking authority to change the relevant practice

11

[were] located." *Id.* at 216 n.3, 217.

In *Hoffman v. United Telecomms., Inc.*, 575 F. Supp. 1463 (D. Kan. 1983), the court also allowed the action to proceed in the district where the defendant's corporate headquarters were located. In the case, Hoffman asserted class action discrimination claims against her former employer, USSI, its parent company, UTI, and other UTI subsidiaries. *Id.* at 1466. Hoffman worked for USSI in Kansas. *Id.* USSI and UTI were both located in Kansas. *Id.* at 1466-67, 1484. However, a group of defendants, UTI subsidiaries referred to as the "Carolina defendants," objected to venue in Kansas. *Id.* at 1483-84. In analyzing venue, the court made the following factual determinations: UTI "exercised a high degree of control over the personnel decisions in all the corporate subsidiaries[,] . . . conducted system-wide searches for inter-subsidiary movement of employees for high level positions[,] . . . maintained a system-wide job pool[,]" and made promotions from within the system-wide job pool. *Id.* at 1482. The court concluded that UTI's involvement was "so substantial as to amount to control over the personnel policies and practices of the subsidiaries." *Id.* Based on those factual findings, the Court held that venue was proper in Kansas for the Carolina defendants based on "the control exercised by the parent corporation, UTI, in regard to its development and enforcement of its personnel policies and practices." *Id.* at 1484.

The Court finds that the *Turnley* and *Hoffman* cases are distinguishable in material respects. To begin, the procedural posture of this case is different than in *Turnley*. Ring is the only named plaintiff here. Ring has not moved yet for class certification and the Court cannot determine at this time whether certification is warranted. In the *Turnley* case, however, there were several named plaintiffs from several jurisdictions, raising the specter of an "unnecessary

12

multiplicity of litigation" if the case was not maintained at Bank of America's home district, even if no class was certified.  576 F. Supp. 2d at 217.

Also, Ring has asserted only a disparate treatment claim, not a disparate impact claim as in *Turnley*.  *Id.* at 216-17.  Ring alleges generally that Roto-Rooter has a policy of preventing women from obtaining high-level management positions and that the policy emanates from corporate headquarters.  However, the evidence presented at the venue hearing, at least at this early stage of the case and in the absence of a full complement of discovery, does not support Ring's framing of the case in the Amended Complaint.  The witnesses testified that branch managers make the hiring and promotion decisions locally at the branch level.  Stewart specifically testified that the general managers decide whether to post job vacancies.  There was no evidence similar to that in *Hoffman* that corporate headquarters maintained a job candidate pool or exercised substantial control over the personnel practices of the branches.  Although the witnesses here conceded that companywide hiring policies *could* be made at the corporate level which would affect all of the branches, there was no evidence that any discriminatory policy exists.  Instead, the evidence suggests that the alleged discriminatory decisions which impacted Ring were made in St. Louis and that Ring felt the effects of the decisions in St. Louis.

In sum, the Court holds that venue is improper in the Southern District of Ohio because the alleged unlawful employment practice did not occur here and the records relevant to that practice are not maintained here.  The Court has the authority to dismiss this action, or in the interest of justice, transfer the case to a district in which it could have been filed.  *See* 28 U.S.C. § 1406(a).  Neither party disputes that Ring's case could proceed in the Eastern District of Missouri.  Rather than dismiss this case, adding delay to the proceedings, the Court will transfer

the action to the Eastern District of Missouri pursuant to 28 U.S.C. § 1406(a).[2]

## IV.    CONCLUSION

For the foregoing reasons, the  Defendant's Motion to Dismiss (doc. 5) on the basis of improper venue is **GRANTED IN PART INSOFAR AS THE ACTION IS TRANSFERRED TO THE EASTERN DISTRICT OF MISSOURI** and Defendant's Motion to Transfer Venue (doc. 6) is **DENIED AS MOOT**.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

---

[2] Although the Court could not consider the class allegations in adjudicating the Motion to Dismiss for improper venue, the Court is sympathetic to Ring's argument that the Southern District of Ohio might be the more convenient venue if a class is certified.  The records which Ring will seek to prove her class allegations—for example, hiring data for all management positions within the company—likely are maintained or more easily is accessible from this district.  Also, Roto-Rooter witnesses who could testify as to companywide hiring practices are likely to work at the corporate headquarters in this District.